

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00205-CV

_____

IN THE INTEREST OF N.L., A CHILD

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 23-9813-158

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

## I. INTRODUCTION

The mother and father of N.L. (Nicole)[1] each appeal from a judgment—rendered after an eight-day jury trial—that terminated their parent–child relationships with Nicole. At trial, the jury heard that when Nicole was seven months old, she suffered several acute leg fractures—and showed signs of healing rib fractures and a possible thumb fracture—while in Mother's and Father's primary care but also while in the sole care of her maternal grandmother (Grandmother) for short periods of time. After (1) hearing testimony from Mother, Father, and Grandmother—during which all three denied causing the child's injuries; (2) considering other evidence regarding Mother's and Father's changing stories about the days leading to Nicole's acute leg fractures and Grandmother's generally consistent story throughout the litigation's course; (3) considering evidence of Father's admitted, persistent untruthfulness during the investigation and service-plan period and Mother's refusal to consider Father as a potential actor; and (4) being provided with voluminous medical records and other exhibits, ten out of twelve jurors determined that Mother's and Father's parent–child relationships should be terminated but that Grandmother—

---

[1]We use aliases to refer to the child and anyone by whom she might be identified. *See* Tex. R. App. P. 9.8(b)(2).

who had intervened in the suit—should be named the child's sole managing conservator instead of the Department of Family and Protective Services.[2]

In their appeals, Mother and Father primarily raise legal and factual sufficiency challenges to the predicate-conduct grounds found by the jury—(D) and (O)[3] for Mother and (D), (E), and (O) for Father; Father also challenges the finding that termination of his parent–child relationship with Nicole is in her best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (O). Because we conclude that the evidence is sufficient to support the jury's endangerment and best-interest findings, that Father's jury-charge complaint should be overruled, and that we need not address Mother's and Father's other complaints, we affirm the trial court's judgment.

## II. GENERAL BACKGROUND[4]

On October 21, 2023, Nicole was seen at an urgent care clinic where she was diagnosed with a "tibia compression fracture" and sent to Dallas Children's Medical Center. Subsequent X-rays taken at the hospital revealed additional fractures to both femurs near the knee, a fracture on Nicole's eighth right-side rib, and two likely rib

---

[2]In addition to the Department, Grandmother has filed briefs in response to Mother's and Father's briefs.

[3]Although the (O) predicate-conduct ground has since been deleted from Section 161.001(b)(1), it was still applicable to this case at the time it was tried. *See* Act of May 14, 2025, H.B. 116, 89th Leg., R.S., ch. 211, § 2.

[4]We dispense with an extended introductory background because we discuss the facts at length in our analysis of Mother's and Father's sufficiency complaints.

fractures on the left side. A possible fracture of Nicole's hand was also noted. The femur and tibia fractures were acute and new while the rib fractures were healing and probably at least ten days old. The hospital's REACH[5] team—which responds when there is a concern that a "child [might] be at risk . . . for abuse"—was notified.

A nurse practitioner on the REACH team spoke to Mother and Father about Nicole's injuries; both of them told her that the only thing that might have happened was that the day before Nicole had fallen forward while pulling up. According to the nurse practitioner, that story was not consistent with the types of fractures that Nicole had; usually, a child with such injuries is "symptomatic right away," and according to the parents, she was "asymptomatic for a time after[]" the fall and pulled to a stand later in the day. The nurse practitioner did not think a fall from a standing position caused the breaks, which would have required more force. Additionally, the rib fractures concerned the REACH team "because their primary cause is encircling the rib cage and squeezing. So they are what [the team] consider[s] highly specific for inflicted injury."

Although Nicole's vitamin D levels were on the low side of normal, the X-rays showed that her bones were well-formed and well-mineralized; she did not show signs of osteopenia, or softer bones.

---

[5]REACH is an acronym for Referral and Evaluation of At-Risk Children.

4

The parents' lack of an adequate explanation for Nicole's fractures, especially considering their different stages of healing, raised the concern for abuse. After the Department and law enforcement questioned the parents, Nicole was removed from their care. Although the parents completed many of the court-ordered services necessary for Nicole's return to their care and sought a monitored return, the trial court decided not to return Nicole to their custody, and the Department eventually sought termination of their parental rights.

## III. GENERAL LAW AND STANDARDS OF REVIEW

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802

5

(Tex. 2012). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *E.R.*, 385 S.W.3d at 554 (citing *Santosky*, 455 U.S. at 747–48, 102 S. Ct. at 1391–92). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *E.N.C.*, 384 S.W.3d at 802; *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *J.F.C.*, 96 S.W.3d at 266. That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is

6

the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *see In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) ("[E]vidence is not legally insufficient merely due to inconsistencies or disputes in the evidence.").

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the petitioner proved one or more of the conduct-specific grounds on which the termination was based and that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## IV. PREDICATE-CONDUCT GROUNDS UNDER FAMILY CODE SECTION 161.001(B)(1)

The jury found that Mother and Father had "knowingly placed or knowingly allowed [Nicole] to remain in conditions or surroundings which endanger[ed her] physical or emotional well-being" and had "failed to comply with the provisions of a court order that specifically established the actions necessary for [them] to obtain the

7

return of [Nicole,] who ha[d] been in the permanent or temporary managing conservatorship of the Department . . . for not less than nine months as a result of [her] removal from the parent[s] under Chapter 262 for . . . abuse or neglect." Tex. Fam. Code Ann. § 161.001(b)(1)(D), (O). The jury also found that Father had "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the child's physical or emotional well-being." *Id.* § 161.001(b)(1)(E).

Each parent challenges both the legal and factual sufficiency of the evidence to prove the respective conduct grounds found by the jury. But because Father failed to preserve a factual-sufficiency challenge, we will review his complaints for legal sufficiency only. *See In re B.J.*, No. 02-24-00428-CV, 2025 WL 646633, at *3 (Tex. App.—Fort Worth Feb. 27, 2025, pet. denied) (mem. op.); *see also* Tex. R. Civ. P. 324. We first consider the endangerment grounds found by the jury. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

## A. APPLICABLE LAW—ENDANGERMENT

Subsections (D) and (E) of Family Code Section 161.001(b)(1) are the endangerment predicate-conduct grounds. To endanger means to expose a child to loss or injury or to jeopardize a child. *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024). Endangerment involves "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the

8

conduct be directed at the child or that the child actually suffers injury." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

The primary distinction between subsections (D) and (E) is the source of the endangerment to the child. *In re J.D.B.*, 435 S.W.3d 452, 463–64 (Tex. App.—Dallas 2014, no pet.) (citing *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.,* 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied)). Subsection (D) addresses the child's surroundings and environment while subsection (E) addresses parental misconduct. *Id.* But parental conduct is relevant to the child's environment under subsection (D). *Id.*; *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also C.E.*, 687 S.W.3d at 310 ("[T]ermination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment."). "That is, '[c]onduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D).'" *J.D.B.*, 435 S.W.3d at 464 (quoting *Castaneda,* 148 S.W.3d at 522); *see also R.R.A.*, 687 S.W.3d at 278 ("[A] pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment."); *In re E.A.R.*, 583 S.W.3d 898, 909 (Tex. App.—El Paso 2019, pet. denied). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) ("A child

9

is endangered when the environment creates a potential for danger that the parent is aware of but disregards."). "Proof that a parent specifically caused an injury is not necessary." *C.E.*, 687 S.W.3d at 310.

"A parent acts 'knowingly' when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk." *In re R.F.*, No. 11-24-00271-CV, 2025 WL 994024, at *6 (Tex. App—Eastland Apr. 3, 2025, pet. denied) (mem. op) (quoting *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.)); *In re A.L.S.*, 660 S.W.3d 257, 264 (Tex. App.—San Antonio 2022, pet. denied). "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being." *R.R.A.*, 687 S.W.3d at 277. Such risks "can be developed by circumstances arising from and surrounding a parent's behavior." *In re L.W.*, No. 05-25-00528-CV, 2025 WL 2808495, at *5 (Tex. App.—Dallas Oct. 2, 2025, no pet. h.) (mem. op.). Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re A.A.*, No. 13-25-00157-CV, 2025 WL 2475157, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 27, 2025, no pet. h.) (mem. op.); *In re E.M.*, 494 S.W.3d 209, 221 (Tex. App.—Waco 2015, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *E.M.*, 494 S.W.3d at 222. Either the parent's conduct or the conduct of a person with whom the parent knowingly

leaves the child that endangers his or her physical or emotional well-being is sufficient. *Id.* However, termination under subsection (E) requires "more than a single act or omission; . . . a voluntary, deliberate, and conscious course of conduct by the parent" is required. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). In either subsection (D) or (E), it is the direct result of the parent's conduct that results in the termination of the parental rights. *E.M.*, 494 S.W.3d at 222.

## B. DEPARTMENT INVESTIGATION, PARENTS' INITIAL VERSIONS OF EVENTS, AND NICOLE'S REMOVAL

The Department's endangerment case focused on the circumstances surrounding Nicole's injuries, the evolution of the parties' versions of those circumstances throughout the case, and the parents' conduct afterward that evidenced both deception and an unwillingness to do things they did not want to do despite the Department's reunification attempts. We will recount this evidence in detail to show how it supports the jury's endangerment findings.

### 1. Emergency Investigator

On October 22, 2023, a Department emergency investigator was dispatched to the hospital and first saw Nicole while she was in a cast that covered her entire lower body. At that time, Nicole appeared to be well-nourished and otherwise in good condition.

11

Mother agreed to speak to the investigator and asked to record the conversation. Mother purported to be Nicole's primary caretaker and said that she rarely took her eyes off of the child. But Mother also told the investigator that "she didn't really know how the injuries could have occurred." Mother then explained to the investigator what had happened the day they took Nicole to urgent care: "[D]ad was home. They went to the pool. They went to the gym together. And [Grandmother] lives in the same apartment complex, so [she] was also kind of involved. And they . . . watched their favorite show that night, which was like a routine for them, and they went to bed."

Mother said that on the same day, she heard Nicole crawling into the bathroom and then heard a thud and Nicole crying.[6] Nicole calmed down when comforted and was "behaving fine" and "like a normal child."

Mother, Father, and Nicole went to Grandmother's apartment in the same complex around 8:00 p.m. when a show they watched started. According to Mother, all three slept over at Grandmother's, with Mother and Father sleeping in the living room and Grandmother and Nicole sleeping in Grandmother's room; Nicole was on a pallet on the floor. Both Mother and Grandmother checked on Nicole overnight. Mother did not say anything about hearing any weird or loud noises overnight.

---

[6]At the time, Nicole could not yet walk but was pulling up.

Around 6 a.m., Mother went to check on Nicole because she heard her being fussy or she heard a "yell." Mother brought Nicole back into the living room where they both fell back asleep on the couch. When Nicole woke up, she was still fussy and "they were kind of trying every little thing to try and soothe her."

Mother told the investigator that when a pacifier, yogurt, and medication failed to soothe Nicole, she took the child back to their apartment. Mother noticed Nicole's cries were "a little different" than normal. When Mother tried to change Nicole's diaper, she noticed that Nicole was lifting her legs and that she seemed to be in pain. Mother took Nicole back to Grandmother's apartment, and at some point, Mother and Father realized Nicole was not putting weight on her legs.

Mother denied that Nicole had had any other falls or that she had been dropped. But Mother did tell the investigator that she saw "like a dot and a line of purplish bruising on [Nicole's] leg."

Mother denied any domestic violence in the home. She told the investigator that she had anxiety related to having been in the military, but she refused to allow the investigator access to her military records.

The investigator noted that Father was nervous, and she thought it was the first time he had talked to a Department representative. By contrast, Mother was "very calm," which is unusual in such a case. Father also denied that domestic violence had occurred or was occurring in the home, and he denied having any mental-health concerns.

13

Father told the investigator the same things that Mother had about their day; Father said that he, Mother, and Nicole went to the pool where Nicole was kicking her legs and acting fine. He did not see Nicole fall in the bathroom, but he heard a "loud thud." He used the same phrase Mother had used to describe Nicole's fall: from "standing height." According to Father, Nicole was acting fine at Grandmother's but for some suspected teething. Although he didn't hear anything all night, he woke up in the morning because Nicole was "being fussy"; she stayed fussy all morning. Father did not notice any external injuries on Nicole.

Neither Mother nor Father could explain how Nicole's fractures had occurred, and they didn't blame anyone for them, including Grandmother. The doctors told the investigator that it was impossible for the leg fractures to have been caused by the type of fall described by Mother and Father; instead, only a "very high fall" could have caused such injuries.

The investigator also interviewed Grandmother, who said Nicole was fine during the night; she mentioned the fall the parents had described. According to Grandmother, Nicole was fussy at 6 a.m., which woke everybody up; at that time, Mother told Grandmother, "I'm going to take care of her." The investigator believed that Grandmother had told her that, later that morning, Nicole had screamed, which is when Grandmother "walked out and found the baby sleeping with [Mother] . . . [on] the couch." At breakfast, Nicole was "inconsolable," crying, and screaming.

14

The investigator was in the room when law enforcement also interviewed Mother and Father; what they told law enforcement corresponded with what they had told her.

The investigator thought that, during the interviews, Father appeared to be more upset than anyone else. Additionally, she did not think Mother or Father was being forthcoming, transparent, or honest when answering her questions. She thought there was reason to believe that Mother, Father, or Grandmother could have been the one who hurt Nicole, but she could not say which one. After concluding her interviews, the investigator was concerned because, in her words, "[W]e have a vulnerably-aged child [and] no one can provide an explanation for . . . the femur fractures, a bone that's pretty hard to break."[7]

### 2. Nonemergency Investigator

A nonemergency Department investigator arrived at the hospital based on a report that Nicole "had presented to the hospital with fractures in various different healing stages with no explanation."[8] She first interviewed Dr. Kristen Reeder, who told her that the fractures could not have been caused by a fall and likely were not

---

[7]She later testified at trial that broken bones in an infant are rare and usually accompanied by an explanation of blunt-force trauma. In her experience, a child who is not yet walking cannot get broken bones from just a fall on his or her own.

[8]When this investigator saw Nicole in the hospital, she was happy, smiling, and fussy only when she wanted to eat.

accidental. Dr. Reeder also told the nonemergency investigator that there was "no indication or evidence of any metabolic or congenital bone disease that could have caused these sort[s] of injuries."

The nonemergency investigator interviewed Father before Mother. Father told the investigator that at 1:30 p.m. on October 20, he and Mother "heard a loud boom and [the child] falling. He described the loud boom as a bowling ball hitting the ground. He stated that she [had] cried a little bit; but then after that, she was fine. He said that they decided to go to the pool after that." According to Father, after he and Mother took Nicole to the pool, they all went to the gym with Grandmother, where Nicole sat in a Bumbo seat.[9] After they came back from the gym, Nicole crawled around in her playpen and slept; the family then went to Grandmother's where Nicole went back to sleep on a pallet. Nicole was fussy when she woke up the next morning, and Father thought she was teething. Mother took Nicole back home to bathe and feed her while he stayed at Grandmother's apartment with Grandmother.

According to Father, Nicole appeared to be "a little off" when he picked her up after Mother returned to Grandmother's apartment. Nicole was crying hysterically, and he had never heard her cry like that before.

When Mother and Father went back to their apartment, Mother tried to get Nicole to stand up. She appeared to be favoring her right leg, so they tried the

_____

[9]A Bumbo is a movable infant seat with openings for the child's legs that allows the child to sit upright.

16

RICE[10] method for a few hours, icing both of Nicole's legs and wrapping a long sock around the child's legs for compression.

When asked who he thought injured Nicole, Father told the investigator that if she had asked him the day before, he would have said he didn't know but that at that time, "after thinking about it," he thought it was Grandmother. But Father did not clarify why he thought that.

The investigator also interviewed Mother. Mother recorded the interview because she said she had gotten "several different stories from different nurses the night before." By this time, a doctor had told Mother that Nicole's fractures could not have been caused by a fall. Mother had also learned that Nicole had several fractures in different stages of healing.

According to the investigator, Mother did not say anything different from Father regarding how Nicole's injuries occurred. Mother said that she found Nicole face down in the bathroom after the fall and that Nicole had cried in the night when her pacifier fell out. Mother told the investigator that, initially, she had no concerns about Grandmother's care of Nicole but that Grandmother could have stepped on Nicole accidentally.[11]

---

[10]RICE is an acronym for rest, ice, compression, and elevation.

[11]The investigator reiterated that nobody told her they had heard Nicole scream in the middle of the night and agreed that it did not make sense that she would not have cried out if her femur had been broken.

Mother told the investigator that "there was a difficult history with" Grandmother,[12] whom Mother called a liar. Mother and Grandmother had been estranged but had reconciled by that time. Mother told the investigator that Grandmother "tends to manipulate situations" and " none of her family members talk to her." But Mother didn't explain to the investigator why, in light of that assessment, she herself was talking to her.

The investigator and a police detective also interviewed Grandmother. Grandmother said that she had noticed that when the family was on their way to the pool,[13] Nicole didn't seem like herself and was sad and crying; Mother told Grandmother that Nicole had fallen. However, Nicole appeared to be fine at the gym.

Nevertheless, when Mother and Father brought Nicole back to Grandmother's apartment to watch a TV show, Nicole was screaming and crying; she settled down when they got there, though, and fell asleep within five minutes of lying down on the pallet. Nicole was still asleep when Grandmother went to bed at 1:00 a.m. According to Grandmother, Nicole woke up twice during the night but went back to sleep when

---

[12]Grandmother and Mother's father divorced when Mother was a young child, and at trial, there was evidence presented that Mother was more bonded to her father and still harbored resentment toward Grandmother about the divorce. Mother was also upset that, while she was in the military, Grandmother had tried to claim her as a dependent on her taxes.

[13]Grandmother saw Mother, Father, and Nicole "on their way to" the pool, but Grandmother did not go to the pool with them.

18

Grandmother gave her a pacifier; she woke up a third time, but Mother tended to her and laid down with her. Around 8 a.m., Nicole woke up crying like she was hungry and smiled when Grandmother went to lie down with her. But she gave a "screeching" cry when Grandmother tried to pick her up. Mother then came and got Nicole and took her to the couch where they both fell asleep. At some point, Grandmother picked up Nicole from the couch, and Nicole started crying. "She put [Nicole] on her leg and she was crying too. And when she bent over to pick up a pacifier, [Nicole] was really crying, and she could tell her legs were really warm." But Grandmother said all of them assumed that Nicole was teething.

According to Grandmother, at some point, Mother took Nicole back to the family's apartment by herself to feed and bathe her. During that time, Grandmother mentioned to Father what she had noticed about Nicole's legs; "his eyes seemed really glossy," and he said he was worried. But after Mother and Nicole came back to Grandmother's apartment, she, Father, and Nicole all went back to their apartment. Although Grandmother had suggested they take the child to urgent care, Mother and Father did not take Nicole for medical treatment until "hours" after noticing she could not put weight on her leg.

After speaking with Grandmother, the nonemergency investigator interviewed Mother and Father together; neither said anything inconsistent from their first interview with her except that Mother had initially denied that Nicole had ever fallen

19

from Grandmother's bed but then admitted that she had done so at about five months old.

The investigator learned that Father worked overnight and that Mother was not working because she is a disabled veteran.

### 3. Removal

The nonemergency Department investigator determined that Nicole could not be sent home with Mother and Father because she could not speak, the parents did not give any plausible explanations for the injuries, and the Department could not determine which of her three caregivers had caused the injuries; therefore, the decision was made to remove Nicole from her parents' custody and place her with her paternal great uncle. Mother and Father did not agree with the decision, but Mother was "calmer" about it. She became emotional when informed about the removal, which is common, and was concerned about breastfeeding. The Department initially ruled that there was "reason to believe" that Mother, Father, and Grandmother had abused Nicole.

### C. MATERNAL-UNCLE PLACEMENT AND MONITORED-RETURN HEARING

### 1. Placement

Nicole lived with her paternal great-uncle and his wife for eleven months after her removal from her parents' custody. With the Department's agreement, Mother and Father eventually were each allowed up to sixteen hours' supervised visitation with Nicole per week; the placement was supposed to supervise this visitation.

During that time, the trial court appointed a Court Appointed Special Advocate (CASA), who worked on the case thereafter for about 500 hours.

An OCOK[14] caseworker met with Mother and Father together at the beginning of the case, and they appeared to have a good relationship; they both reported that they had strong support and denied that any domestic violence had occurred between them. They also denied having any mental-health conditions other than that Mother was taking medication for anxiety. Mother said that she was attending therapy at the VA.

According to the caseworker's first assessment, Mother and Father appeared to be a strong unit. But as the case progressed, the caseworker started to become concerned that she was seeing signs that Father was financially and emotionally abusive toward Mother: "It became a type of control and neediness that [he] had that she was to direct all her attention in to supporting him. And so it appeared that this relationship took a significant toll on her, when originally it was quite a united front."

The Department prepared service plans for Mother and Father. Father signed his on November 30, 2023, and Mother signed hers on December 13, 2023. During the course of the case, the Department implemented two safety plans to try to work toward family reunification. The first plan was implemented because Nicole fell off

---

[14]OCOK is an acronym for Our Community Our Kids, which is a private entity that contracts with the Department to provide case-management services. *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pet. denied) (mem. op.).

the bed at her placement but was not injured. The second one was implemented when Mother had a physical altercation with the placement in April 2024, amid concerns that the parents had been having improperly supervised, and possibly unsupervised, contact with Nicole. No one told the Department about this altercation even though the police were called.[15]

## 2. Monitored-Return Hearing

In May 2024, the trial court held a hearing to determine whether to return custody of Nicole to Mother and Father on a monitored return.[16] *See* Tex. Fam. Code Ann. § 263.403.

### a. Department witnesses

At the monitored-return hearing, the caseworker testified that both parents had completed all services requested of them except that they were still "engaged in individual counseling." She agreed when asked if they had been cooperative and "done everything . . . asked of them." When asked if she had any concerns "with regard to [their] participation," she said, "Not with participation, no." Nevertheless, she testified that the Department had "numerous concerns" with returning Nicole to her parents' custody. The primary concern was that neither parent had shown

---

[15]Mother recorded part of this incident, and the recording was admitted into evidence at the trial. Mother testified that she did not lose control of her emotions but that she was upset and yelling because she was afraid Father's uncle was going to try to take her phone away from her.

[16]The reporter's record for this hearing was admitted into evidence at the trial.

accountability for, or given an explanation regarding, how Nicole could have gotten the fractures; thus, the Department was unsure how to protect Nicole around them in the future. Additionally, although the parents had appeared to "check[] the boxes," they did not appear to have "learned from their behaviors and the things that put their child into care."

The caseworker had no concerns about the parents' interaction with Nicole during visits. But she was concerned that they made changes to the schedule frequently and without the required prior approval. This conduct was ongoing, and Mother and Father had not changed it even after the caseworker talked to them about it. She was also concerned that the version of events Mother and Father gave to service providers kept changing.

The caseworker also testified that Mother and Father "state that they have a strong connection. They are very complimentary of each other. They're very playful with each other. They -- they help each other out. They pick up the slack when the other one doesn't have it. So they -- they really report a very positive relationship." When asked, "So is it fair to say that if one of them did perpetrate these injuries, then the other one is – the entire time has had each other's back?" she answered, "Yes." She also agreed that the parents' lack of honesty regarding other aspects of the case "indicate[s] that they may know more about how [Nicole] received these injuries than they are willing to express." She also agreed that "it would be understandable if they were both afraid of being arrested and going to jail." But the fact that neither parent

was willing to at least entertain the idea that the other might have hurt Nicole was concerning.

Mother's psychological testing showed that she had elevated anxiety levels, was afraid of making mistakes, and was susceptible to reacting emotionally. Although Mother was receiving therapy from the VA, that therapist would not talk to the caseworker about Mother's treatment or release any of Mother's VA records because Mother had not given consent for her to do so. This raised a concern for the Department that the records showed something Mother did not want it to know about.

### b. Mother and Father

Mother denied knowing how Nicole's injuries had occurred. She testified that she had left Nicole in Grandmother's care "maybe a few hours a couple times a week, but not [unsupervised] overnight." Mother noticed Nicole's leg injuries the morning of October 21 while in Grandmother's apartment. She testified that she became suspicious of Grandmother because Grandmother had sent a text in which she was specifically concerned about Nicole's legs.[17] Mother also stated, "[Father] and I ha[d] been parenting [Nicole] for six months prior to all this happening, and [there were] no concerns whatsoever with either one of our parenting styles and protecting her." Mother admitted that she took a nap after realizing that Nicole was hurt: "So I did.

---

[17]This text, and Mother's defensive-sounding response to it, were later admitted at the trial.

[Father] stayed up inside the playpen with her. So we kind of had her propped up in the playpen with her legs elevated. This is for the RICE method. And she ended up falling asleep and taking a nap, and I did as well."

Mother denied breaking up with or getting back together with Father and denied having any issues with him. She denied that he could have caused Nicole's injuries because they were "together for the entire day and then even the following morning. Like, we hadn't left each other's sight."[18] She suspected Grandmother because, according to Mother, Nicole was fine until she was with Grandmother all night. But Mother could not explain how that fact would take into account Nicole's rib fractures. Mother admitted that Grandmother had never hurt her or any other children when she was a child; nevertheless, she still believed Grandmother was responsible for Nicole's injuries:

> I think that my mother is very capable of manipulating and lying because she has done so to me and my loved ones as well. So not after all these years do I think that she turned into an abuser, but I think that she did something and she doesn't want to come forth and disclose.

Mother admitted telling the police detective that she sometimes disassociates, but she explained that she did not fully understand the meaning of that word when she said it and that the Department representatives had interpreted that word as being more significant than she meant it. Mother denied refusing to provide a release of her

---

[18]Mother testified that she and Father took a shower together the night before Nicole's fractured legs were discovered.

VA records since her separation from active duty.[19]  According to Mother, she had given a consent for those records, but she had not given a consent for the Department to get her active-duty medical records because she did not think that the Department had requested them.

Mother responded to a question about why she and Father had not taken extra classes not required by the Department by saying, "[W]e're just kind of tired of doing kind of these things that[,] for us, we don't see [as] necessary."  Nevertheless, she answered, "Absolutely," when asked if she would agree to comply with any further counseling requested.

Mother denied not telling the Department in advance about any schedule changes for visitation:  "They're always aware of schedule changes.  We have a group chat with the CASA, CPS[20] and the kinship guardians, as well as [Father] and I."

Mother testified that if Nicole were returned to her and Father's custody, she would be alone with Nicole for most of the day while Father was at work, and then Father would be alone with Nicole in the evenings while Mother was at school.  If they ever needed help, they would ask Father's uncle.

---

[19]Mother later testified at trial that she was honorably discharged in July 2023; at that time, Nicole was around four and one-half months old.

[20]CPS, an acronym for Child Protective Services, is a subdivision of the Department.  *L.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-07-00055-CV, 2009 WL 3806158, at *1 (Tex. App.—Austin Nov. 13, 2009, no pet.) (mem. op.).

In contrast to Mother's testimony that she and Father had showered together before the family went to Grandmother's apartment for the evening, Father testified that he had showered alone. That night, according to Father, Nicole cried out once, but it was just a fussy cry. She gave a really alarming, loud, and elevated cry around 8 or 9 a.m. At that time, he and Mother were both on the couch and Grandmother was with Nicole. But Father didn't ask Grandmother at the time what had happened.

According to Father, neither he nor Mother realized how severe Nicole's fractures were until they got to the hospital; Father said that no one at the urgent care had explained to them how serious they were. But he also testified, "[T]he day that we discovered the fractures, she wasn't able to move at all." Despite that fact, he agreed that he and Mother had waited to take Nicole to the doctor because he had been taught that home remedies should be tried first.

Father continued to believe that Grandmother was responsible for Nicole's injuries, but he said that he couldn't be sure because he wasn't there when the injuries occurred. Father did not think Mother could have caused Nicole's injuries because she was caring and attentive and they "were together the day before leading up to the incident." When asked how he could be so sure about Mother's innocence considering how much time she spent alone with Nicole, he said, "Because there was no sign[] of it prior to. The only sign that occurred was the night of."[21] He also

_____

[21]Father said, "What I do know is that my child was fine before going in that room that night. And when she woke up, she wasn't fine."

27

thought Grandmother had broken Nicole's ribs: "Because [Mother] would not have do such a thing like that." Father did not confront Grandmother about the injuries; he just decided to stop talking to her completely.

According to Father, he did everything the Department had asked him to do other than missing only one therapy session. Father denied telling Mother in November 2023 that they were broken up.

### c. Grandmother

Grandmother testified that she had moved to Texas on August 12, 2023, to assist Mother and Father with Nicole. According to Grandmother, Mother was elated about the move.[22] Mother and Father lived a few doors down the hall from her. Grandmother admitted that after her move and before Nicole's injuries, she had cared for Nicole alone three to five times for a few hours each; she saw Nicole four or five days a week.

Although Grandmother did not go to the pool with Mother, Father, and Nicole on October 20, she saw them all before and after they went. After the three went to the pool, they went back to Mother's and Father's apartment for four to five hours,

---

[22]In contrast, Mother had testified that Grandmother had approached her about moving to Texas because she was trying to get away from a partner and felt unsafe; Mother and Father purportedly were "hesitant about it" but acquiesced to Grandmother's moving to Texas so that she could help them with Nicole. Grandmother and Mother were just beginning to re-establish their relationship when Nicole's injuries were discovered.

and then they all went to the apartment gym together from around 9:45 to 10:45 p.m. At the gym, Grandmother thought Nicole was quiet and not like herself.

After the gym, Mother and Father went back to their apartment to shower and returned to Grandmother's apartment closer to midnight; at that time, Nicole was "screaming and hollering, crying," and seemed to be in pain. Father put Nicole to bed on a pallet in Grandmother's room, which was a normal thing for him to do. According to Grandmother, she fell asleep on the couch along with Mother and Father, and she went to bed after waking up around 1:00 a.m.

Grandmother testified that Nicole woke up twice during the night and was a little fussy, so Grandmother put her pacifier back in. Mother and Father did not wake up those times. The third time Nicole woke up, Mother took her. Around 8 a.m., Grandmother woke up and Nicole was awake; she was not smiling. Mother was in the door, and when Grandmother went to get Nicole, she gave out a scream and cry "that [Grandmother] ha[d] never heard before." Mother told Grandmother that maybe Nicole was sleepy and took her back to Mother's and Father's apartment to change her; when Mother came back, she and Nicole fell asleep on the couch.[23] When Nicole woke up and Grandmother had finished with her morning routine, she took Nicole to feed her. At that time, she noticed Nicole's legs were warm, but she thought it was because she had just awakened from sleeping next to Mother.

_____

[23]Grandmother said that she remembered "in hindsight" that after changing Nicole and coming back, Mother had told her that something was wrong with Nicole's legs.

29

Grandmother finally knew something was actually wrong with Nicole when Nicole dropped her pacifier on the floor and Grandmother bent down to pick it up—Nicole kept crying.

Father had left the apartment, and Mother left while Grandmother was feeding Nicole yogurt. Father came back to get Nicole and looked concerned when Grandmother said something was wrong with her. Mother did not come back.

Grandmother was not sure whether Mother or Father had caused Nicole's injuries. Although she lived just a few doors down from them, she had never noticed anything unusual or seen any warning signs. According to Grandmother, Mother and Father were doting and involved parents. When asked when she thought Nicole's injuries had occurred, she said that she thought they had occurred before everyone went to the gym or even before Mother and Father went to the pool with Nicole.

### d. Nicole's pediatrician

Nicole's pediatrician recommended that she not go home with Mother and Father because she could not tell who had hurt her and "the severity of the injuries are [sic] massive in a nonambulatory child." Neither Mother nor Father ever told her that they thought Grandmother had caused the injuries. She also thought that it was unusual that Mother and Father did not seem irate that their child had been injured.

There was no indication of Nicole's rib injuries at her September 12 well-child check-up. But the pediatrician said the rib injury would have been painful, and it would have been hard for Nicole to breathe.

### e. Disposition and Aftermath

The trial court denied Mother's and Father's motions for a monitored return. Ultimately, because of all the concerns with the paternal-uncle placement, Nicole was placed with a non-relative foster family.

## D. THE TRIAL

### 1. Nature of the Injuries

Dr. Reeder, a board-certified general pediatrician, child-abuse pediatrician, and member of the Dallas Children's REACH team, testified about the nature of Nicole's injuries. Nicole was already in a cast and splint when Dr. Reeder examined her. Her records showed that Nicole had been irritable and fussy when her lower legs were manipulated.

Dr. Reeder testified that Nicole had "fractures of both distal femurs[—]the end of the bone closest to the knee of both femurs"—and the upper "end of her right tibia, which is the shin bone or one of the bones of the lower leg . . . closest to the knee." Nicole also had "a healing eighth rib fracture on the right," healing fractures to her eighth and ninth ribs, and a possible—but not definitive—fracture in one of her hands.[24] The leg fractures were acute, meaning they showed no signs of healing,

---

[24]The team did not focus as much on this fracture because of the other ones, but Dr. Reeder nevertheless found it "very concerning, especially in an infant[,] because it's just not a common thing that we would see, even from accidental injuries that infants may get themselves into." And it could not have been caused by the force of gravity.

in contrast to the ribs. The rib fractures did not occur at the same time as the leg fractures.

The leg fractures were "buckle or compression fractures."[25] A buckle fracture "requires a loading force on the bone," such as when a child "falls on the monkey bars and puts the arm out to protect. All the weight comes down on that bone."[26] She said that leg fractures in an infant are complex and akin to the type of injury seen when older children jump off something very high or land on their knees.

Dr. Reeder testified that it was not unusual for Nicole not to have bruising to her legs: "[T]he vast majority of cases that we see, again, as I said, in babies that can have multiple acute fractures, meaning I think they happened recently, they may have no bruising at all."

Dr. Reeder said that it is important for parents to be honest about how the child's injuries occurred because the subjective element of a history of what might have happened to the child is important to a diagnosis. She needs specific information about a fall to assess whether it could have happened in such a way as to cause the injury suffered. According to Dr. Reeder, Nicole's leg injuries could not

_____

[25]The radiologist had described the femur fractures as oblique fractures, but Dr. Reeder thought they looked like "buckle or compression fractures as well." Dr. Reeder explained that there was no conflict between her opinion and the radiologist's because they were both describing the same fractures in two different ways.

[26]The nurse practitioner who saw Nicole at the hospital described compression fractures like what happens when one crushes a can; such injuries are not typical in children who are not walking.

have occurred from a simple fall from a child's height to her knees.[27] To have multiple leg fractures together is complex, and she could not "come up with an explanation of how it happened." That is why the lack of a history explaining the injuries was so concerning to her. She explained,

> [S]he is an immobile infant and so it's impossible an infant with these injuries, regardless if they are caused by trauma . . . and no one would know what happened. A caregiver should be able to tell me -- should be able to give me histories of trauma to explain why an immobile infant has injuries.

Dr. Reeder answered, "Most likely, yes" when asked whether a "complex fall" could occur from a parent's being "pushed down" and falling while carrying a child.

Dr. Reeder was shown a video of Nicole at the pool with her parents[28] and said that it was possible Nicole might have already had the fractures and been able to play in the pool the way she did. Dr. Reeder also thought that Nicole might have been able to sit in the Bumbo seat at the gym.[29] Dr. Reeder explained that Nicole might not have shown discomfort from kicking or moving but that soft weight-bearing

---

[27]The nurse practitioner also testified that Mother's and Father's fall-forward explanation could not have explained Nicole's injuries.

[28]This video was admitted into evidence for the jury to view.

[29]In contrast, the nurse practitioner had testified that the leg injury would have had to occur after Nicole went to the pool and had a bath: "[T]his type of fracture, she wasn't able to pull up. And after going to the pool, they describe going to the pool afterward, she -- and also after bathing, after the pool. And then she likes to pull up in the bath, and so she wouldn't have been able to do that with fractures." But she also testified that whether the Bumbo seat would have hurt Nichole depended on where it hit her legs.

would have been a problem. For example, Nicole was noted as having been kicking her leg while in the ER. Dr. Reeder could not say for sure what Nicole would have done when her legs were broken, but she expected that Nicole would have given "some sort of sign of discomfort"; in other words, "she likely gave some sort of indication she was hurt when it happened."[30]

According to Dr. Reeder, in the absence of trauma, the rib fractures would have occurred because of squeezing or compression of the chest. Dr. Reeder stated that normal care of an infant, such as holding or swaddling, doesn't result in those types of injuries. Dr. Reeder opined, "Rib fractures in the absence of a history of trauma to explain them, are highly specific for inflicted injury, especially in immobile infants and especially in a case where I have two sets -- two sets of fractures in different stages of healing, which indicated they happened at different times."[31] Dr. Reeder also opined that, based on the signs of healing, one rib fracture was around ten to fourteen days old, and the other two were about a month old, at least. Dr. Reeder agreed that it is not unusual for children with rib fractures to be asymptomatic because "their symptoms could be crying, and a seven-month-old cries for lots of

---

[30]Dr. Reeder did not think that Nicole's injuries were exacerbated or worsened from the delay in taking her to urgent care.

[31]The nurse practitioner testified that the rib injury was from squeezing and would have required more force than a hug.

reasons." Most of time, there are no external signs of injury, and it is not uncommon for parent not to know a child's ribs are broken.

At the hospital, Mother and Father asked to speak to Dr. Reeder alone; Mother wanted to know if Nicole's injuries could have happened "in the bedroom alone with [Grandmother] overnight" and asked her multiple questions about how Nicole's injuries could have occurred.[32] Mother and Father also asked if they could have occurred from rolling off a pallet. Dr. Reeder told Mother and Father that Nicole's injuries could not have occurred from being stepped on or just rolling off the bed.

Dr. Reeder also checked for possible medical reasons that Nicole could have presented with the multiple fractures and found no evidence of a medical condition[33] that could have caused them. The rest of Nicole's bones looked normal, and there were no signs of osteogenesis imperfecta (OI).[34] When Nicole's X-rays were repeated

---

[32]Mother and Father did not tell Dr. Reeder that Nicole had cried out at any time during the night, as they later testified to. All they told her was that Mother had nursed Nicole and they went back to sleep until 10:40 or 11 a.m. the next day, which was first time Mother noticed that Nicole was uncomfortable.

[33]The nurse practitioner testified that Nicole's creatinine was a bit low, which has nothing to do with fractures; also, her alkaline phosphatase was a bit high, which will elevate with fractures. Two other blood-count measurements were also a little low, but not in a significant way.

[34]According to Dr. Reeder, OI—sometimes referred to as "brittle bone disease"—"affects collagen in the body." Dr. Reeder explained that OI is congenital; it does not develop because of diet. When asked why Nicole was not tested for OI, she explained that it involves genetic testing, is "very expensive," not 100% accurate, and not necessary here. After reviewing Nicole's X-rays, she also ruled out rickets because that disease would show changes to bones that were not present here. She

five to six months later, the rib fractures were "nearly completely healed." No new fractures were seen by Dr. Reeder or reported to her at Nicole's next appointment.

Dr. Reeder summed up her concerns about Nicole's injuries: "At the end my assessment or my concerns were that I have a seven-month-old, mostly immobile [child] with multiple fractures that required multiple different types of mechanisms, of varying stages of healing. So I was concerned for – they were mostly -- sorry -- most consistent with repeated episodes of inflicted injury." In her expert opinion, Nicole's injuries were most consistent with child abuse. According to Dr. Reeder, at Nicole's age, a caregiver should have been able to explain how the injuries occurred if they were accidental. If a parent knew that a child was being repeatedly abused, she would expect the parent to remove the child from that environment.

## 2. Status of Criminal Investigation

A police detective assigned to investigate possible criminal charges described Mother as cooperative and giving the impression of caring deeply for Nicole. The detective testified that charges against Mother and Father—but not Grandmother— had been referred to, and had remained pending with, the grand jury for six months before the termination trial. But no one had been arrested or indicted for Nicole's injuries at the time of trial.

affirmed that child abuse is more common than rickets. Dr. Reeder further explained that OI and rickets tend to show different types of fractures and are developmental to a child's beginning to walk.

36

### 3. Mother's, Father's, and Grandmother's Testimony

Mother, Father, and Grandmother all testified at length, and the reporter's record of the monitored-return hearing was admitted into evidence. Thus, not only did the jury have the opportunity to consider the credibility of all three in person but also it was able to weigh evidence of the accounts of events that each had given during the course of the case.

### a. Mother

The Department spent much time eliciting testimony about Mother's mental-health history before and after her discharge from the military and during the early months of Nicole's life.

Mother agreed when asked, "You were referred to medical management for unspecified anxiety disorder characterized by uncontrollable worry, social anxiety, obsessive thinking, irritability and impaired focus, restlessness, insomnia and compulsive behaviors, correct?"[35] Mother admitted that in June and July 2023, she had reported having obsessive thoughts and that she had feared hurting someone or herself or being responsible for something terrible happening. According to Mother, she was constantly worried about saying the wrong thing and hurting someone's

---

[35]In June 2023, Mother was experiencing panic attacks, compulsive skin picking, obsessive thinking, irritability, impaired focus, obsession with germs, and avoidance of odd numbers. Around the same time, she also took an assessment in which she admitted being afraid of acting on unwanted impulses and being bothered by intrusive sounds and thoughts.

feelings. She had met with a social worker because, according to Mother, sometimes in her relationship with Father she would "say things that weren't very nice" and she had no filter.

At the time of trial, Mother was on full disability from the military. She had been receiving mental-health services until the month of her discharge, but she was not able to finally initiate services from the VA until January 2024, after Nicole's removal.[36]

Despite testifying at the monitored-return hearing that on October 20 she and Father had taken a shower together after going to the gym—leaving Nicole in the playpen—Mother testified at trial that she put Nicole in the playpen and then showered alone and that, while in the shower, she heard Nicole crying. According to Mother,

> Well, while I was in the shower, I yelled out to [Father], What happened? He didn't answer me. But he came into the bathroom shortly after [Nicole] had stopped crying and I didn't hear any more. I asked again what happened while I was standing in the shower; he said nothing[,] she just cried and crawled to the pillow and fell asleep so I didn't think anything more.[37]

---

[36]She had tried to set up services in November 2023, but her call to the VA was disconnected in the middle of intake, and she could not reconnect until January 2024.

[37]Mother also testified at trial that Father had been responsible for the first shift of feeding Nicole at night, for which she pumped breastmilk. She also recounted other occasions during which Father had been alone with Nicole.

Mother nevertheless admitted that she had been "one hundred percent sure it was" Grandmother who had injured Nicole, but by the time of trial, she was not sure whether Grandmother or Father was responsible for Nicole's injuries.

Mother also admitted that during an argument in August 2023, Father had threatened to run her over with a car after she had stood in front of it; he hit her with it. Mother admitted being overwhelmed in her relationship with Father, stated that her anxiety attacks had been related to the "stress of her relationship with" Father, and said that she had stopped having anxiety attacks after they broke up.

According to Mother, she and Father had not totally broken up at the time of the monitored-return hearing. She said he had lied about them breaking up in November 2023 but that they were no longer sleeping in the same room by May 2024.

### b. Father

Father testified that he knew about the mental-health issues Mother was experiencing the summer Nicole was born but that he nevertheless left Mother alone with the child. He testified that even though Mother is manipulative and aggressive, he chose to leave Nicole with her because Nicole is her child and he did not think Mother was capable of "doing such a thing."

After previously denying that any domestic violence had occurred between him and Mother, Father testified about a prior incident in which he said he was holding Nicole while he and Mother were arguing. Mother wanted him to give Nicole to her, but he refused to do so. In the midst of their argument, he tried to go to the

39

bathroom for privacy but then Mother pushed him, so he gave her the child and left her with Mother even though Mother was still angry.[38]

Father admitted lying "repeatedly to everyone in this case," including under oath during the monitored-return hearing. At trial, he purported to tell the truth, though, about when he and Mother broke up—in November or December 2023— and claimed to have lied to the caseworker (and Mother) when he had previously said he and Mother were still together at that time.[39] According to Father, although he had lied about other things, he had not lied about what happened to Nicole: Father said that Mother had lied if she told the caseworker that he had committed any domestic violence against her. According to Father, Mother had a problem with lying.

A recording of Father's two-hour-long March 24, 2024 phone call with Grandmother (before the monitored-return hearing) was admitted into evidence. During the call, Father told Grandmother that, based on what the Department was telling him about how the injuries could have occurred—with a post-partum mother

---

[38]Mother explained what had happened when she pushed him: "He was holding [Nicole], and I reached for her to feed her. And he kneed me, and I just pushed his knee out of the way."

[39]According to Father, he and Mother continued to live together in 2024 until May 31 or June 1, even though they had broken up and were no longer in a romantic relationship. However, Father had also previously told a therapist that he and Mother were still in a romantic relationship.

with mental-health issues—Mother "fit the profile."[40]  To Father, Grandmother again recounted her version of the events leading up to the discovery of Nicole's broken legs and denied being the one who hurt her.  Father told Grandmother that it was the Department's idea that someone had stepped on Nicole and that he had never actually suspected her but just went along with that idea; according to Father, Grandmother was the initial suspect in causing Nicole's injuries until all three of them became suspects.  He also told Grandmother that once he learned Nicole's leg and rib injuries had occurred at different times, he knew Grandmother had not caused the injuries.  Father told Grandmother that if he were to get custody of Nicole, he wanted to make sure that she had a relationship with Grandmother even if he had to conceal their contact.

Father also testified that after Nicole was removed, Mother and her family conspired to get Grandmother drunk in an attempt to get her to confess to causing Nicole's injuries.  According to Father, Grandmother did not confess, and they left her passed out on the floor of her closet.[41]

Father agreed that he had not kept Nicole safe.

----

[40]Mother testified that she first started to suspect that Father could have caused Nicole's injuries when she found out about this phone call; she could not think of any other reason he would even talk to Grandmother if he still suspected her of hurting their child.  Because he had been so in agreement with her that Grandmother had caused the injuries, she had never suspected that he could have been responsible.

[41]Grandmother thought she might have been drugged that night because she had drunk only two alcoholic beverages.

### c. Grandmother

When asked how she felt when hearing that Father had left Nicole alone with Mother while she was experiencing such intense mental-health problems, Grandmother said, "Terrified." She did not think that the situation was a safe and stable one for a newborn. Grandmother had not seen any red flags or mental-health concerns when Mother was a child.

Grandmother denied that Nicole gave a big cry during the night. She agreed that although it was not unusual to put Nicole on a pallet, it was the first time it had ever been done at her house. Any other time the family had stayed over at Grandmother's, Nicole had slept in the living room with Mother. Grandmother suspected that Nicole had already been injured when the family came over to her apartment for the night. She found it odd that when they had gone to the gym, Mother and Father had carried Nicole in and out in the Bumbo seat and never took her out; they had never done that before.

### 4. Other Relevant Evidence

The trial court admitted into evidence a screenshot of Grandmother's and Mother's text exchange on October 21, before Mother and Father took Nicole to urgent care. At 3:49 p.m., Grandmother texted, "Hey y'all, check her legs to see if they are warm because it felt like it earlier so y'all may wanna take her to Urgent care. Just to be on the safe side." Mother replied at 5:49 p.m.:

42

Hey ma, we know you're concerned for [Nicole] as well and I don't want to come off rude towards you or anything but I want you to give us space to discuss as parents with one another what's best for [Nicole] and how to go about her care. We will ask you for advice and guidance when we need it but just think about how frequently we get unsolicited advice or suggestions when [Father] and I have already discussed, done research, spoke to her pediatrician etc. from people on both sides of our families. It's not that you're wrong but just trust that we got her. She's ours and we'll ALWAYS do what's best for her. If there's something we need from anyone we'll ask.

Grandmother agreed that this language told her, "[e]ssentially, [to] back off."

The caseworker testified that as she started to hear things that made her suspect Mother was a victim of emotional and financial abuse, she also became concerned about Mother's living with Father even when they were supposedly no longer in a romantic relationship. Specifically, she had heard "[s]tatements about him booby trapping the house. Statements about him locking her out of her belongings. Statements about sort of financial control as she would, like, pay rent for both her and him. Statements of kind of intimidation of him losing his temper." The caseworker started becoming concerned about the anger.

Although Father's service plan required him to participate in a Batterer's Intervention Protection Program (BIPP), he never attended such a program and testified at trial that he did not think he needed to.[42] He did complete an anger-management course.

---

[42]In his brief, Father claims—citing his own testimony—that the Department wanted Father to complete this program because Mother pushed him. But the service

43

When asked if Mother had endangered Nicole, the caseworker answered, "[S]he was aware, in her description of her relationship with [Father], about his nature, his temper, his controlling. So she still continued to allow him to parent her child." She believed that Father had endangered Nicole because of the domestic violence that had occurred, his knowledge of Mother's mental-health issues, and the fact that Nicole seemed to have been used as a tool in his and Mother's arguments even if they did not involve physical violence.

Mother finally told the CASA a few months before trial that she thought Nicole's legs might have been hurt before the family went to the pool. The CASA explained why she did not think Grandmother had caused Nicole's injuries:

> But the small window of time in the last seven to ten days where [Grandmother] was alone with [Nicole], both she and the parents have said, at various points, that [Nicole] didn't seem like herself before they even got to [Grandmother's] apartment. And [Grandmother] is the one who first noticed something was wrong with [Nicole], in spite of not being her parent, and urged the parents to go get medical treatment for [her].

> She -- I have gone back and looked at her interviews with the police, with the hospital staff, with the CPS investigators. I've talked to her about this as early as February of 2024. I've spoken with various professionals involved in this case. Her story has remained the same, whereas both parents' stories ha[ve] changed significantly in almost every aspect.

---

plan including BIPP as an item notes that Mother had accused Father of being controlling and angry while they were still living together post-removal.

The CASA did not think Mother and Father took their services seriously and did not think that they had been honest with their service providers, showing that they did not want "to get as much out of the services as they possibly [could] to help their child."

The CASA testified that Father had FaceTimed Grandmother in December 2024 during one of his visits with Nicole. Father admitted this to the CASA, and he told her that he had wanted to keep the Facetiming with Grandmother a secret from OCOK. But even though the CASA thought Nicole was enjoying seeing Grandmother, Father stopped the FaceTime calls when Grandmother filed her petition in intervention.

Mother's VA therapist testified that during the course of her treatment, it became clear that Mother wanted to separate from Father and that it seemed like there was emotional or psychological abuse going on.

### E. ANALYSIS

No expert could say for sure who inflicted Nicole's injuries, and Nicole's injuries were not externally visible. Neither Mother nor Father would admit injuring Nicole, and for the better part of the case, they refused to admit that the other might have been responsible, despite the fact that they both later admitted to instances of domestic violence and discord in their relationship—which they had falsely painted as

supportive and free of strain.[43]  They gave no plausible explanation for how Nicole had seven broken bones, including the theory that Grandmother had stepped on Nicole.[44]  The caseworker and the CASA also suspected—from what Mother finally started to tell them about her relationship with Father—that Mother was a victim of financial and emotional abuse as well as possible physical abuse.  *See In re K.M.*, No. 02-18-00073-CV, 2018 WL 3288591, at *8 (Tex. App.—Fort Worth July 5, 2018, pet. denied) (mem. op.) (concluding that continuing to live with violent partner, along with child, shows failure to remove the child from a dangerous environment).  Despite this, Mother at best chose to doggedly cling to her belief that Grandmother was a liar and manipulative and thus must have been lying about not having injured Nicole—despite the fact that Grandmother had urged Mother and Father to take Nicole to the doctor much earlier than they did.[45]  At worst, she and Father knew

---

[43]It was for the jury to weigh the conflicting attempts to "point fingers at each other and choose which evidence to credit."  *See C.E.*, 687 S.W.3d at 310.

[44]Mother argues in her brief that we have not and should not follow the reasoning set forth in *In re J.P.B.*, in which the Texas Supreme Court held that the jury could have reasonably inferred that a child's father endangered his infant son by leaving him in the care of his mother when the child had repeated unexplained, nonaccidental injuries for which the father had to take him to the emergency room.  180 S.W.3d 570, 573–74 (Tex. 2005).  Because the Texas Supreme Court has recently employed the same inference in a sufficiency review, we rely on that authority.  *See C.E.*, 687 S.W.3d at 311 (stating that "neither Mother nor Father provided a plausible explanation for [the child's] injuries, which supports an inference that at least one of them knew their cause").

[45]Father and Grandmother discussed in their recorded call that Mother thought this text was indicative of Grandmother's guilt—that she knew Nicole's legs were

exactly how and when Nicole had been injured and chose to try to use Grandmother as a scapegoat. The jury could have determined that neither Mother nor Father had been appropriately protective of Nicole.

Moreover, the jury was entitled to consider Mother's and Father's conduct that showed an awareness of an endangering environment. *A.A.*, 2025 WL 2475157, at *8. Instead of immediately taking Nicole to the doctor when she was obviously injured and crying inconsolably, Mother and Father chose to take her home, apply home remedies, and wait hours before taking her to the doctor. Regardless of the fact that, according to Dr. Reeder, this conduct did not exacerbate Nicole's injuries, it is indicative of guilt—that they did not want the extent of her injuries to be discovered. Father admitted lying to the caseworker and the CASA and even admitted lying under oath; Mother withheld information from the Department about the seriousness of her mental-health condition and her relationship with Father. *See C.E.*, 687 S.W.3d at 313–14; *In re L.M.M.*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Additionally, Mother and Father did not take their service plans and placement rules seriously despite the fact that they each had considerable visitation time with, and access to, Nicole. *See In re K.J.*, No. 02-25-00093-CV, 2025 WL 1600219, at *6 (Tex. App.—Fort Worth June 5, 2025, pet. denied) (mem. op.).

---

injured because she is the person who injured them. But the jury could have placed a different significance on this evidence—that Mother ignored Grandmother's advice because *she* knew how Nicole had been injured.

47

Based on the foregoing, we conclude that the evidence is both legally and factually sufficient to support the jury's finding that Mother knowingly placed or knowingly allowed Nicole to remain in conditions or surroundings which endangered her physical or emotional well-being and legally sufficient to support the jury's findings that Father knowingly placed or knowingly allowed Nicole to remain in conditions or surroundings which endangered her physical or emotional well-being and engaged in conduct that endangered her physical or emotional well-being. We overrule Mother's first issue and the first part of Father's first issue.

## V. BEST INTEREST

In the second part of his first issue,[46] Father contends that the evidence is legally and factually insufficient to support the finding that termination of his parental rights is in Nicole's best interest. Because he did not preserve a factual-sufficiency challenge, we address the legal sufficiency of the finding only.

### A. APPLICABLE LAW

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire

---

[46]Because we have held that the evidence is sufficient to support the jury's endangerment findings, we need not address Mother's and Father's second issues related to the jury's subsection (O) predicate-conduct findings. *See In re K.J.*, No. 02-25-00093-CV, 2025 WL 1600219, at *10 n.12 (Tex. App.—Fort Worth June 5, 2025, pet. denied) (mem. op.). We also need not address Mother's third issue challenging the jury's decision to award Grandmother sole managing conservatorship of Nicole because it is brought in the alternative if we were to sustain her sufficiency challenge. *See* Tex. R. App. P. 47.1.

48

record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both a Subsection (b)(1) predicate ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Factors that the trier of fact in a termination case may also use in determining the best interest of the child include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.*

## B. APPLICABLE FACTS AND ANALYSIS

We will group our analysis by each factor for ease of reference.

## 1.  Nicole's Desires

Nicole was almost three years old at the time of trial and thus unable to express her wishes.  But she was bonded to Father, and he behaved appropriately with her at observed visits.  Nicole also had a large extended family on both Father's and Mother's sides that stayed in contact.

Before Nicole was removed from her parents' care, Grandmother saw her daily.  At the time of trial, Grandmother had not seen Nicole since she was in the hospital; the Department had initially decided there was "reason to believe" that she—along with Mother and Father—was responsible for Nicole's injuries because Grandmother had been with Nicole around the time her injuries were discovered and because no one would give an adequate, plausible explanation for Nicole's injuries.  After Grandmother appealed the Department's determination, it changed the finding as to her to "unable to determine."  The CASA implied that Nicole enjoyed seeing Grandmother when Father FaceTimed her in December 2024.

## 2.  Nicole's Present and Future Needs and Parties' Stability and Plans For Her

Nicole's injuries had healed, and she was developmentally on track.  She participated in gymnastics and had not suffered any new broken bones.

Father testified that he had an apartment and a job.  The caseworker thought Father's apartment was appropriate.  But she was concerned that he had changed jobs frequently throughout the case.  Father planned to put Nicole in Montessori school and, because he worked Friday through Sunday, he planned for his uncle—the same

one with whom Nicole had initially been placed—to care for her on the weekends. Father no longer planned to have 50/50 joint custody with Mother.

Grandmother had a full-time job with a steady income and worked from home, setting her own schedule. Grandmother's home study appeared appropriate to the caseworker, but the Department had not placed Nicole with her because she was "part of a timeline" during the period in which Nicole was injured. Grandmother testified that she was able to meet Nicole's needs and would provide her with a loving and nurturing environment. Grandmother was not sure if she would allow Nicole to have contact with any of the extended family.

The Department's plan for Nicole was adoption by a nonrelative. Nicole's foster parents were bonded to her and wanted to adopt her. The CASA recommended that the Department be named Nicole's conservator but that Nicole should be placed with Grandmother; Nicole's ad litem argued that the jury should name Grandmother managing conservator.

### 3. Parental Abilities of Those Seeking Custody

Nicole was Father's only child. Father had taken parenting classes and, according to the instructor, was very engaged and showed that he was learning. But the caseworker did not think the parenting classes facilitated Father's learning protective measures to prevent what led to the injuries in the first place: "We were still seeing the same parenting style[, and t]hey were very resistant to changing [it] because they were very proud of their parenting style." The caseworker did not

believe that Father could identify a safe environment. Grandmother did not think Father was mature enough at the time of trial to parent Nicole, nor did she think that he would protect her from Mother.

Grandmother had raised two children—Mother and her brother—and had cared for many children in her extended family, at church, and as a volunteer.

### 4. Danger to Child and Excuses for Acts and Omissions

The jury was entitled to give great weight to the evidence about Nicole's injuries, the nature of them, and the fact that Father showed a pattern of dishonesty and an unwillingness to attend BIPP to try to address the concerns about his relationship with Mother. *See In re C.D.L.*, No. 04-23-00105-CV, 2024 WL 3349099, at *12 (Tex. App.—San Antonio July 10, 2024, no pet.) (mem. op.). Mother and Father never gave an adequate explanation for how Nicole got hurt. According to the nonemergency investigator, Mother and Father were both aware when Nicole's legs were broken that she was in pain. Nevertheless, the caseworker thought that Mother and Father considered themselves victims in the case and that Father had "minimized" the seriousness of the impact on Nicole.

Instead of acting like a concerned parent trying to regain custody of his child, Father lied under oath; refused to engage in meaningful therapy to confront the circumstances leading to Nicole's injuries until well into the case; failed to show an appreciation of appropriate boundaries; failed to appreciate and help Mother attempt to deal with her mental-health issues; and persisted in presenting a "united front" with

52

Mother in blaming Grandmother until his relationship with Mother had started to unravel, at which point he tried to get Grandmother on his side under the guise of blaming Mother.

Based on the foregoing, we conclude that the evidence is legally sufficient to support the jury's finding that terminating Father's parent–child relationship with Nicole was in her best interest. We overrule the remainder of Father's first issue.

## VI. JURY-CHARGE COMPLAINT

In his third issue, Father contends that the trial court's refusal to include a requested definition of "significant impairment" in the part of the jury charge addressing parent access and conservatorship confused the jury and forced it to choose termination over access. The requested definition was read into the record during the charge conference:

> Significant impairment must be proved by a preponderance of the evidence indicating that some specific identifiable behavior or conduct of the parent demonstrated by specific acts or omissions of the parent will probably cause harm.

> This link between the parent's conduct and harm to the child may not be based on evidence that raises mere surmise or speculation of possible harm. The nonparent's heavy burden is not satisfied by merely showing that the nonparent would be a better custodian of the child and, quote, close calls, end quote, should be decided in favor of the parent.

> Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the parent. When determining fitness of a parent, the material time to consider is the present. Evidence of past misconduct may not, by itself, be sufficient to show present unfitness . . . .

53

The charge asked the jury to answer the termination-related questions first and contained separate, alternative conservatorship sections for it to answer depending on its answers to the termination questions—Section Two only if it had answered yes to the required termination questions and Section Three only if it did not answer yes to all of the required termination questions. Father contends that the jury must have been trying to choose between termination and some type of conservatorship or parental access because it sent a note asking, "[C]an we get a legal definition of the right to have physical possession?" But the "right to have physical possession" is included in the Section Two that the jury was instructed to answer if it was trying to decide between Grandmother and the Department as Nicole's permanent managing conservator. The term "significant impairment" is not used until Section Three, which the jury was instructed not to answer if it had answered yes to the required termination questions. We presume that the jury followed the trial court's instructions. *See Credit Suisse AG v. Claymore Holdings, LLC*, 610 S.W.3d 808, 827 (Tex. 2020). Nothing in the record indicates otherwise. Thus, even if the trial court had erred by failing to include the requested definition, Father cannot show harm. *See* Tex. R. App. P. 44.1(a)(1). We overrule Father's third issue.

## VII. CONCLUSION

Having overruled Mother's and Father's dispositive issues, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  October 27, 2025